FIRST TRUST CO. v. CROOKED CREEK R. & COAL CO. et al.

(District Court, N. D. Iowa, C. D.    June 12, 1917.)

1. RAILROADS ⬅171(3)—PRIORITIES—MERGER OF TITLE—"MORTGAGES"—"MERGER."

The stockholders of a railroad company entered into an agreement with L., the president of an electric line operating in adjacent territory, which contemplated the transfer of all of the capital stock of such railroad company to a new corporation, and for payment by the issuance of bonds secured by a mortgage on the property of the railroad company. The agreement further provided that the representatives of the stockholders might designate a majority of the directors of the railroad company, its successors or assigns, and two of the general officers. Pursuant to such arrangement the stock was assigned to L., but the arrangement was never consummated. Instead the railroad company, at the direction of L., issued bonds to the stockholders, who, in accord with the old agreement, designated a majority of directors. The company withheld from connecting carriers that portion of freight rates to which they were entitled as carriers of interline freight, although $4,000 additional bonds of the company were delivered to L., president of the electric line, who was to use them to raise funds to meet the expenses of the company. Shortly before suit by the mortgage trustee to foreclose the mortgage or deed of trust L. returned to the stockholders or their representatives the stock

assigned to him. *Held* that, as a mortgage is the conveyance of an interest or estate by way of pledge for the security of a debt to become void upon its payment, in which the legal title is vested in the creditor though in equity the mortgagor remains the actual owner, and merger of estates occurs when a greater estate and a lessor estate coincide in one and the same person without any intermediate estate existing in another, the stockholders could not, by virtue of their ownership of bonds secured by a mortgage or deed of trust, assert rights prior to those of carriers of interline freight, for the estate of stockholders by mortgage merged in their interest as stockholders. Citing Words and Phrases, First and Second Series, Merger; Mortgages.

2. RAILROADS ☞171(10)—MORTGAGES—MORTGAGEES IN GOOD FAITH—WHO ARE —PRIORITIES.

In such case, as L., the president of the electric line, was a party to the whole arrangement, he cannot be deemed a holder in good faith of bonds to the amount of $4,000, and entitled to priority over the other carriers whose claims arose out of an interchange of traffic.

3. RAILROADS ☞171(10)—MORTGAGES—PRIORITIES—CREDITORS' TRUST FUND THEORY.

In such case, as the assets of a corporation are a trust fund for the benefit of its creditors, the corporate stockholders are not entitled to the aid of a court of equity in foreclosing their mortgage and obtaining priority over the other carriers having claims arising out of interchange of traffic.

4. CORPORATIONS ☞424—AUTHORITY OF DIRECTORS—RIGHT TO QUESTION.

In such case, as the stockholders of the railroad company retained the right to select a majority of the directorate, and did so, they cannot, on the theory that L., president of the electric line, actually controlled operations, question the acts of the directorate, a majority of which they named.

5. RAILROADS ☞171(3)—MORTGAGES—PRIORITIES—CREDITORS—RIGHTS OF.

In such case, the claims of the interline carriers are entitled to priority, even though they accrued prior to six months immediately preceding the appointment of a receiver, the stockholders not being entitled to priority over corporate creditors.

In Equity. Bill by the First Trust Company, as trustee, against the Crooked Creek Railroad & Coal Company, in which the Chicago & Northwestern Railway Company, the Illinois Central Railroad Company, and the Northern Pacific Railway Company separately intervened. Decrees for interveners.

Submitted on separate petitions of intervention of the Chicago & Northwestern Railway Company, Illinois Central Railroad Company, and the Northern Pacific Railway Company, interveners.

The main suit is by the First Trust Company, a Wisconsin corporation, as trustee in an indenture of trust and first mortgage against the defendant Crooked Creek Railroad & Coal Company, an Iowa corporation, to foreclose said mortgage, which was made by the defendant to the plaintiff as trustee on January 3, 1911, upon all of its property then owned, or that it might thereafter acquire, to secure the payment of certain bonds of the railroad company made on that date; $116,500 of which bonds, it is alleged, were actually issued and outstanding at the time of filing the bill, which was on July 22, 1915. The appointment of a receiver was asked in the bill because of the failure of the railroad company to perform certain of its obligations assumed under the trust deed and because of its insolvency. An answer of the defendant was filed with the bill, in which the allegations of the bill are admitted, and consent given to the appointment of the receiver, who was thereupon appointed, and who took charge of the property of the defendant company, and continued its operation under the orders of the court.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In due time the Chicago & Northwestern Railway Company, an Illinois corporation, the Illinois Central Railroad Company, an Illinois corporation, and the Northern Pacific Railway Company, another railway corporation, separately intervened, each claiming that the defendant railroad company was owing certain amounts, which it was entitled in equity to priority of payment from the property covered by said mortgage over the claims of the bondholders.

In its intervening petition, as finally amended, the Chicago & Northwestern Railway Company alleges that the defendant railroad company is owing it $11,901.15, all of which was for the ordinary charges and earnings accruing to it from the defendant company as a connecting carrier of interline freight, car per diem, and other items arising out of such interchange of traffic, $4,003.94 of which amount accrued within the six months immediately preceding the appointment of the receiver, and $7,897.21 prior to such six months' period; an itemized statement of which claim is attached to its intervening petition, which is admitted by the plaintiff, the defendant, and the receiver to be correct.

The Illinois Central Railroad Company, in its intervening petition as finally amended May 12, 1916, makes a claim much like that of the Chicago & Northwestern Railway Company for $7,381.44, for which it asks that it be decreed a claim upon the property of the railroad company prior in equity to the claim of the bondholders under the mortgage to the plaintiff. It further alleges that of said amount it has judgment against the defendant in the district court of Hamilton county, Iowa, dated June 2, 1914, for $3,410.20, leaving a balance of $3,971.24, of which sum $166.05 accrued subsequent to the appointment of the receiver, and is a part of the operating expenses of the road by the receiver, and asks that said amount, and also its entire claim for $7,381.44, be allowed as a claim prior in equity to the claim of the bondholders under the indenture of trust and first mortgage in suit.

The Northern Pacific Railway Company in its intervening petition claims $593.11 from the defendant company accruing to it as interline freight for the exchange of traffic between it and said intervener as connecting carriers, all of which accrued more than six months prior to the appointment of the receiver.

Kenyon, Kelleher & Price, of Ft. Dodge, Iowa, for plaintiff First Trust Co.

James C. Davis, of Des Moines, Iowa, for interveners Chicago & N. W. Ry. Co. and Northern Pac. Ry. Co.

Helsell & Helsell, of Ft. Dodge, Iowa, for intervener Illinois Cent. R. Co.

REED, District Judge (after stating the facts as above). A large amount of testimony has been taken upon these respective claims, and it is stipulated by the parties that such testimony shall be used in the determination of each of said intervening claims. The controlling facts disclosed by the testimony are practically without dispute, some of them being matters of record.

The defendant Crooked Creek Railroad & Coal Company, which will be called the defendant, was incorporated under the law of Iowa, its first charter expiring November 8, 1895, when it was renewed for a period of 20 years, which expired November 8, 1915. The purpose of its incorporation, as stated in its charter, was the construction and operation of a short line of railroad, some 18 miles in length, from Webster City, in Hamilton county, Iowa, to Lehigh, in Webster county, the operation of certain coal mines, and the manufacture of brick and tile and other clay products from the lands owned by the company.

The operation of the coal mines seems to have been the principal reason for its original incorporation. It was not authorized by its charter to buy or sell its own corporate stock or the stock of other corporations. Prior to January 3, 1911, when the trust deed was made, the defendant had given no mortgage upon its property, and upon that date its entire outstanding stock of 2,250 shares, which had been reduced to the par value of $50 each, was practically all held by the original incorporators of the company or their heirs, to whom it descended. As early as 1904 the defendant's coal mines were becoming exhausted, the tonnage from that source diminished, and the stockholders were seeking to dispose of its property. Its stockholders were not practical railroad men. On March 24, 1909, the defendant company, by its board of directors as authorized by its stockholders, entered into an agreement with Homer Loring, of Boston, Mass., president of the Ft. Dodge, Des Moines & Southern Railroad Company (an electric line of railroad operating in the territory adjacent to the defendant's railroad), giving him an option for four months to buy its said railroad, which agreement is as follows:

"This agreement grants to Homer Loring an option and right to purchase, at any time within four months from the date of this agreement, all of the railroad property of said Crooked Creek Company, for the sum of $112,500, payable in first mortgage bonds of a new corporation to be organized by said Homer Loring, the payment of which bonds is to be secured by a first mortgage covering the railroad property, and an extension from said present line of railway to a junction with the Ft. Dodge, Des Moines & Southern Railroad Company, at or near Gypsum City, Iowa."

Attached to the option is a list of the railroad property owned by the defendant company covered by the option.

On September 1, 1909, said agreement was extended for a period of six months. On August 18, 1910, all of the stockholders of the defendant company and Homer Loring entered into another agreement, whereby the stockholders, as parties of the first part, set over and assigned to the party of the second part (Homer Loring) all of the shares of the capital stock of the Crooked Creek Railroad & Coal Company, after the assets of said company, other than its railroad properties, have been transferred to, and its liabilities, other than current items, assumed by, a new corporation as thereinafter set forth. The capital stock of the defendant company is to be paid for by the issuance of $112,500 of bonds, to be secured by a mortgage to be executed upon the property of the Crooked Creek Railroad & Coal Company, and such additions to such property as shall be made by the said Homer Loring.

On the same date, August 18, 1910, an agreement was entered into by and between George E. Burnham and Charles L. Burnham, president and secretary, respectively, of the Crooked Creek Railroad & Coal Company (and stockholders in said company), as representing all the then stockholders of said company, parties of the first part, and Homer Loring, party of the second part. This agreement refers to an agreement between the stockholders of the Crooked Creek Railroad & Coal Company and Homer Loring of the same date, and provides for certain things to be done by the said Homer Loring in the way of improv-

ing the Crooked Creek Railroad and Coal Company.  In addition to this the agreement contains the following provision:

"The said parties of the first part herein (George E. Burnham and Charles L. Burnham), or their successors in office, may designate a majority of the directors of the Crooked Creek Railroad & Coal Company, its successors or assigns, and two of the general officers, to wit, president and secretary, and that he (Homer Loring), the said party of the second part, his heirs, executors, administrators or assigns, will elect or cause to be elected such majority of the directors and officers so nominated by said parties of the first part."

September 27, 1910, an agreement between all of the stockholders of the defendant railroad company, after referring to the agreement of August 18, 1910, recites the desire of the stockholders to provide for the payment of the liabilities of  the defendant railroad company; and further provides that the first four directors to be selected under the arrangement are designated as F. Paul Stone, Minnie M. Wilson, George E. Burnham, and Charles L. Burnham; and George E. Burnham is to be elected as president and Charles L. Burnham as secretary of the company.  It is further provided that F. Paul Stone, Minnie M. Wilson, George E. Burnham, and Charles L. Burnham are to represent their several interests under and pursuant to the terms of said two agreements dated August 18, 1910; and the stockholders agreed, upon the delivery to them of their proportion of the first mortgage bonds representing the sale of their stock, to pay the then liabilities of the Crooked Creek Railroad & Coal Company, other than current items, together with 3 per cent. of $112,500, to George E. Burnham, as commission for making the sale to Loring.

From these negotiations, and others shown by the testimony, it appears that a sale of the Crooked Creek Railroad property, or the stock of that company, to Homer Loring, of Boston, was agreed upon by the stockholders in 1909.  Mr. Loring was then in control of the Ft. Dodge, Des Moines & Southern Railroad Company, and he was to make or cause to be made some improvements in the road, and extend it to a connection with the Ft. Dodge, Des Moines & Southern Railroad at or near the city of Ft. Dodge, in Webster county.  He was also to form a new corporation, and the stockholders of the defendant company were to receive for their stock in that company bonds of the new corporation to an amount equal to their stock, to be secured by a first mortgage or trust deed upon the property of the new corporation.  This arrangement progressed so far that the entire stock of the Crooked Creek Company was delivered to Loring, but was not transferred to him upon its books.  For some reason not clearly appearing, but probably because  of the financial condition of the Ft. Dodge, Des Moines & Southern Company, this deal with Mr. Loring was never finally consummated, and it seems to have been abandoned.  In the latter part of December, 1910, another deal was consummated between said stockholders and Mr. Loring, whereby the defendant company was to issue its bonds up to $300,000 or more, to be secured by a first mortgage or trust deed upon the property of that company, the stockholders agreeing to pay its indebtedness to that date, and were to receive the bonds of the company so to be issued and secured in the amount of $112,500 in lieu of the stock of that company then owned or held by them.  Pursuant to

this arrangement, $112,500 of the bonds of the defendant company so to be secured were issued and delivered to the stockholders, and the first mortgage or trust deed in suit made January 3, 1911, and duly recorded, to secure such bonds. In February, 1914, $4,000 additional bonds of the company were issued and delivered to Mr. Loring, who was to use the same to raise funds to meet the then present needs of the Crooked Creek Company. The defendant company was thereafter operated up to the time of the appointment of the receiver in July, 1915, by a board of directors and officers chosen as provided by the agreement of September 27, 1910, before referred to; George E. Burnham being president; and Charles L. Burnham, his brother, secretary, and they, with the two other directors named, who were associated in interest with them in the stock of the company, were a majority of the board of directors so chosen, and owners of practically all of the stock of the defendant company. It was while the road of the defendant company was being so operated under the management of said board of directors that the indebtedness due to the interveners, and perhaps others, was incurred; and some officer or officers of the Ft. Dodge, Des Moines & Southern Company during such time were chosen as auditor and treasurer of the defendant company, received its earnings, the greater part of which arose from the traffic furnished by the interveners as connecting carriers, and therefrom regularly paid the interest on such bonds at the rate of 5 per cent, semiannually, amounting to $5,625 a year, to the holders of such bonds through the Ft. Dodge, Des Moines & Southern Railroad Company, except the interest last maturing just prior to the appointment of the receiver; the interline traffic balances due to the interveners being used for that purpose, and for the purpose of paying the necessary current expenses of operating the road, instead of being paid to the interveners as they became due. Shortly before the appointment of the receiver the stock of the defendant company so transferred to Mr. Loring was returned by him to the stockholders, or to George E. Burnham, the persident of the defendant company and their attorney in fact for them.

It may be here said that the original stock of the defendant company actually issued and outstanding consisted of 2,250 shares, of the par value of $100 each, which represented the value of the road and certain coal and other lands owned or acquired by it; but later a corporation called the Lehigh Coal & Land Company was organized by the stockholders of the defendant company, or some of them at least, to which its assets other than its railroad property were transferred, thus leaving as the property of the defendant company its railroad properties alone; and through some arrangement between the stockholders the capital stock of the defendant company was reduced 50 per cent., or to $50 per share, thus making the 2,250 shares of the capital stock of the defendant company at the time of the issuance of the bonds in January, 1911, of the par value of $112,500, and by a vote or resolution of the stockholders the directors were authorized to issue $300,000 or more of bonds to be secured by the mortgage or trust deed in suit, as before stated.

Counsel for the respective parties have argued at much length, both orally and in elaborate briefs, contending:

First, for the complainant, that the bonds were authorized in good faith to pay for the stock of the Crooked Creek Company, and were and are valid obligations of the defendant company secured by the mortgage or trust deed in suit, which was duly recorded before any of the alleged indebtedness of the interveners was incurred, and therefore the prior lien upon its property.

Second, for the interveners it is urged (1) that the original agreement between the stockholders and Homer Loring, had it been fully consummated, would have been in effect a dissolution of the Crooked Creek Railroad Corporation, and a distribution of its assets among its stockholders, who were in fact the legal owners of such property, to the exclusion of its creditors, other than such stockholders (if they can be considered as creditors of the corporation), and void under the Iowa statute (sections 1620, 1621, Code of Iowa 1897); (2) that inasmuch as that agreement was never in fact consummated, but abandoned, the subsequent agreement between the stockholders and Mr. Loring, whereby the bonds of the defendant company actually issued to its stockholders and secured by the mortgage in suit, was in effect an attempt to substitute the bonds of the company for its capital stock, and make the stockholders to whom such bonds were delivered creditors of the company secured by a first mortgage upon all of its property, which would be in fraud of all creditors of the defendant company prior and subsequent to the issuance of such bonds.

[1] To follow counsel in their respective contentions would unduly prolong this opinion, and serve no useful purpose. Of course, if the bonds and mortgage in suit were made in good faith upon a then valid consideration, without notice to the holders thereof of any lack of consideration, or of some defect or invalidity therein, they would be a prior lien in favor of the holders upon the railroad property covered by the mortgage; but the undisputed facts are that the bonds, other than the $4,000 above mentioned, were issued and delivered to the stockholders of the defendant company in lieu of the stock of that company then held and still held by them, and are based upon no other consideration; the stock of the company delivered to Mr. Loring under their first agreement having been returned and redelivered by him to them after that agreement fell through and shortly before the commencement of this suit. The $4,000 of bonds issued to Mr. Loring in February, 1914, will be referred to later.

It further appears, without substantial dispute, that after the issuance of the bonds the owners of the stock of the defendant company to whom they were so issued, and for whose benefit the present foreclosure suit is prosecuted, were the same persons, except perhaps it be the holders of the $4,000 of bonds. A mortgage may be shortly defined as the conveyance of an interest or estate in property by way of pledge for the security of a debt, to become void upon its payment. The legal ownership is vested in the creditor; but, in equity, the mortgagor remains the actual owner until he is debarred by his own default or by a judicial decree. 4 Kent's Com. 136 (marg.); 2 Wash. Real Property,

475 (5th Ed.). The making of the mortgage or trust deed in suit, then, so far as it conveyed the property of the defendant company, was a conveyance of the legal title to secure the bonds so issued; but just how the stockholders of the company could acquire any greater or other interest under the mortgage than they, as the legal holders of the stock of the company, already possessed, is not readily conceivable. At most, the making of the mortgage by their own board of directors, if it had any effect as to the stockholders or creditors of the corporation at all, would only operate as a merger of the mortgage or lesser estate in the greater or legal estate already held by the stockholders. The merger of estates is said to occur when a greater estate and a lesser coincide and meet in one and the same person, without any intermediate estate existing in another. 2 Blackstone, Com. 177 (Cooley's Ed.); volume 5, Words and Phrases, First Series, and volume 3, Second Series; Bouvier's Law Dictionary (Rawle's 3d Ed.) title "Merger," and cases cited. There being no intermediate or other estate existing in any other person than the stockholders of the defendant company, the equitable estate or lien created by the mortgage, if it created any estate at all, merged or was absorbed by the greater or legal estate held by the stockholders.

[2] Of the $4,000 of bonds issued and delivered to Mr. Loring, as hereinbefore stated, the proceeds received from such bonds, except some expense in disposing of the same, were used to meet the present needs of the defendant company, and it may be urged that Mr. Loring is a good-faith holder of said $4,000 of the bonds. But Mr. Loring was a party to the arrangement for the issuing of all of the bonds, had full knowledge of the purpose for which they were issued, participated in the transaction whereby they were issued, and cannot rightly be regarded as a good-faith holder of them, as against these interveners.

[3] Further than this, the proofs also show that the owners of the stock were, when the bonds were issued and delivered to them, in possession of the railroad operating the same by a board of directors of their own selection, and thereafter remained in possession and operation of the road until the appointment of the receiver, receiving the income and earnings of the road, and paying to themselves therefrom the interest on such bonds as it matured, except perhaps the last installment maturing before the appointment of the receiver, and using for this purpose, and for the purpose of paying the necessary expenses of the operation of the road, the interveners' share, as connecting carriers, of such earnings, instead of paying such share to the respective interveners as they become due, and by this suit are now seeking to prevent the interveners and other creditors from recovering their rightful dues from the property of the defendant company. A court of equity will not lend its aid to the consummation of such a transaction as against creditors of the defendant corporation. Railroad Company v. Howard, 7 Wall. 392, 409, 410, 19 L. Ed. 117; Chicago, etc., Ry. Co. v. Chicago Bank, 134 U. S. 276, 287, 10 Sup. Ct. 550, 33 L. Ed. 900; Louisville Trust Company v. Louisville, etc., Ry. Co., 174 U. S. 674, 683, 684, 19 Sup. Ct. 827, 43 L. Ed. 1130; Kansas City Ry. v. Guardian Trust Co., 240 U. S. 166, 36 Sup. Ct. 334, 60 L. Ed. 579;

Luedecke v. Des Moines Cabinet Co., 140 Iowa, 223, 118 N. W. 456, 32 L. R. A. (N. S.) 616, and cases cited; Central Trust Company of Illinois v. Chicago, Anamosa & Northern Ry. Co. (Illinois Central Co., Intervener) (D. C.) 232 Fed. 936, 944, 945.

In Railroad Company v. Howard, above, it is said, beginning on page 409 of 7 Wall. (19 L. Ed. 117):

"Equity regards the property of a corporation as held in trust for the payment of the debts of the corporation, and recognizes the right of creditors to pursue it into whosesoever possession it may be transferred, unless it has passed into the hands of a bona fide purchaser; and the rule is well settled that stockholders are not entitled to any share of the capital stock nor to any dividend of the profits until all the debts of the corporation are paid. Assets derived from the sale of the capital stock of the corporation, or of its property, become, as respects creditors, the substitutes for the things sold, and as such they are subject to the same liabilities and restrictions as the things sold were before the sale and while they remained in the possession of the corporation. Even the sale of the entire capital stock of the company, and the division of the proceeds of the sale among the stockholders, will not · defeat the trust nor impair the remedy of the creditors, if any debts remain unpaid, as the creditors in that event may pursue the consideration of the sale in the hands of the respective stockholders, and compel each one, to the extent of the fund, to contribute pro rata towards the payment of their debts out of the moneys so received and in their hands."

In Louisville Trust Co. v. Louisville, etc., Ry., 174 U. S. at page 683, 19 Sup. Ct. at page 830 [43 L. Ed. 1130], above, Mr. Justice Brewer, speaking of railroad mortgage foreclosures, said:

"We may not shut our eyes to any facts of common knowledge. We may not rightfully say that the contract of mortgage created certain rights, and that when those rights are established they must be sustained in the courts, and no inquiry can be had beyond those technical rights. We must, therefore, recognize the fact—for it is a fact of common knowledge—that, whatever the legal rights of the parties may be, ordinarily foreclosures of railroad mortgages mean not the destruction of all interests of the mortgagor and a transfer to the mortgagee alone of the full title, but that such proceedings are carried on in the interests of all parties who have any rights in the mortgaged property, whether as mortgagee, creditor, or mortgagor. * * * Assuming that foreclosure proceedings may be carried on to some extent at least in the interests and for the benefit of both mortgagee and mortgagor (that is, bondholder and stockholder), we observe that no such proceedings can be rightfully carried to consummation which recognize and preserve any interest in the stockholders without also recognizing and preserving the interests, not merely of the mortgagee, but of every creditor of the corporation. In other words, if the bondholder wishes to foreclose and exclude inferior lienholders or general unsecured creditors and stockholders he may do so, but a foreclosure which attempts to preserve any interest or right of the mortgagor in the property after the sale must necessarily secure and preserve the prior rights of general creditors thereof. This is based upon the familiar rule that the stockholders' interest in the property is subordinate to the rights of creditors, first of secured and then of unsecured creditors. And any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation."

[4] It is further urged that Mr. Loring, or the Ft. Dodge, Des Moines & Southern Company, was in the actual control and operation of the defendant's road after the agreement of August 18, 1910, and that it was Mr. Loring, or the Ft. Dodge, Des Moines & Southern Company, that used the earnings of the interveners, instead of the

stockholders or bondholders after the making of the mortgage. There is some evidence tending to support this contention; but it clearly appears that under the agreements of August 18 and September 27, 1910, the stockholders retained the right to and did in fact name a majority of the board of directors of the defendant company, who thereafter directed and controlled the operation of its road from that date to the appointment of the receiver. Neither as stockholders nor as bondholders, therefore, are they in position to question the action of the directors in the operation of the road up to the appointment of the receiver in July, 1915.

[5] Whether or not the claims of the respective interveners accrued within or prior to the six months immediately preceding the appointment of the receiver is quite immaterial, for the claims of the stockholders as such, or as bondholders under the mortgage, are inferior, in either event, to the equities of the interveners. Central Trust Co. v. Chicago, A. & N. Ry. Co. (Illinois Central R. R. Co., Intervener) (D. C.) 232 Fed., above, 941, 944, 945.

I am therefore of the opinion that the claims of the respective interveners, without priority as between themselves, are prior in equity to the claims of these bondholders, upon the property of the defendant company, who are also stockholders of such company, and decrees may be prepared accordingly.

It is so ordered.