(No. 18456.

The St. Louis Union Trust Company, Plaintiff in Error, *vs.* The Wabash, Chester and Western Railroad Company.—(The Illinois Central Railroad Company *et al.* Defendants in Error.)

*Opinion filed February 20, 1929—Rehearing denied April 3, 1929.*

GEORGE B. GILLESPIE, (GILLESPIE, BURKE & GILLESPIE, of counsel,) for plaintiff in error.

CHARLES E. FEIRICH, and EDWARD C. CRAIG, (W. S. HORTON, and R. V. FLETCHER, of counsel,) for defendants in error.

Mr. COMMISSIONER PARTLOW reported this opinion:

The St. Louis Union Trust Company (hereafter called the trust company) in January, 1924, filed two bills in the circuit court of Randolph county to foreclose two trust deeds given to secure bonds of the Wabash, Chester and Western Railroad Company (hereafter called the Wabash-Chester Company.) The cases were consolidated, a receiver was appointed and claimants were ordered to file their claims with the receiver. The Yazoo and Mississippi Valley Railroad Company (hereafter called the Y. and M. Company) filed its intervening petition, claiming $3063.52 due for interline freight. The Illinois Central Railroad Company (hereafter called the Illinois Central) filed an intervening petition, claiming for miscellaneous bills, $4825.63; interline freight, $78,075.03; per diem account, $37,238.64; freight road and traffic claims under rule 255, $835.19; foreign road traffic and claims under Denver plan, $19.33; unpaid notes, $16,023.24; making a total of $137,017.06, with a credit of $10,485.94, leaving a balance due of $126,531.12. Both petitioners alleged that their claims were preferred and were payable out of the *corpus* of the property and ahead of the bondholders. The trust company filed an answer to each petition, in which denial was made of substantially every fact alleged. The cause was referred to a master to take the evidence and report his conclusions. The master found that the amount due the Illinois Central was $126,165.87; that of this

amount $56,501.44 accrued within six months of the appointment of the receiver and $69,664.43 accrued prior thereto; that the amount due for interline freight was $78,075.03; that the amount due the Y. and M. Company was $3063.52, and $923.85 accrued within six months; that both railroads had proved their claims for preferences as to the parts which accrued within six months, and that the preferences should be paid not out of the *corpus* of the property but only out of the net earnings. All parties except the Southern Gem Coal Corporation (hereafter referred to as the Gem Company) filed objections to the master's report, which were overruled, and they were renewed as exceptions before the chancellor. They were overruled by the chancellor and a decree was entered in accordance with the report of the master. An appeal was prosecuted to the Appellate Court for the Fourth District, where the decree was reversed and the cause remanded, with directions to enter a decree making the claims liens upon the property prior and superior to the lien of the trust deeds sought to be foreclosed. The case is before this court on a writ of *certiorari*.

There is no controversy as to the amount of these claims. The principal question is whether they should be paid out of current income, as found by the master and by the decree, or whether they are preferred claims payable out of the *corpus* of the property ahead of the rights of the bondholders. The Y. and M. Company was a separate corporate entity but had the same officers and managers as the Illinois Central, its accounts were kept in the same offices as the accounts of the Illinois Central, and the evidence with reference to the operations of the Wabash-Chester Company and the knowledge of the Illinois Central with reference to such operations applies to the claim of the Y. and M. Company the same as it applies to the claim of the Illinois Central.

The Wabash-Chester railroad extends from Chester, in Randolph county, to Mount Vernon, in Jefferson county. It crosses the Illinois Central at Pinckneyville and Tamaroa, and at each of these points the two roads have track connections. The Gem Company had mines along the Wabash-Chester railroad at Jamestown, Cutler and Percy, and had mines at other places. It established re-screening plants at Pinckneyville and Mount Vernon, where coal was re-loaded and shipped over the Wabash-Chester railroad to connections with the Illinois Central and other roads.

The Wabash-Chester Company has had three receivers—one in 1876, one in 1914, and the present one. The road never earned any dividends for its stockholders, it paid very little interest on its bonds, it had great difficulty in paying its running expenses, and it has no income from current receipts out of which to pay these claims. The second receiver was in charge from 1914 until April 17, 1920. On the latter date there were 12,500 shares of capital stock and $690,000 of bonds outstanding, secured by the trust deeds sought to be foreclosed. The most of this stock and these bonds at that time belonged to C. B. Cole and his brother, H. C. Cole. C. B. Cole had been the president of the road for many years and he and his brother had lost large sums of money in attempting to operate it. On April 17, 1920, a contract was executed between C. B. and H. C. Cole as first party, the Gem Company as second party and the Wabash-Chester Company as third party, by the terms of which the Coles sold to the Gem Company about ninety per cent of the stock of the railroad. This gave the Gem Company 11,243 shares, the Coles 920 shares, Jesse Dimond, Jr., 232 shares, D. D. Hodges 77 shares, N. E. Gee and George W. Evans 10 shares each, Jesse Dimond, Sr., Ray A. Dimond and John M. Dillavou two shares each, and C. G. Randall and H. M. Rea one share each. The Coles also sold to the Gem Company $190,000 of the bonds and placed in escrow $200,000 of bonds, which they agreed

to sell to the Gem Company upon the performance of certain conditions named in the contract. The Coles agreed to cancel the interest coupons on the bonds held by them, which amounted to a large sum. At that time the unpaid current indebtedness of the railroad was estimated at $100,000. The Gem Company advanced to the railroad that sum, less $45,192.96, which was retained by the Gem Company to pay taxes, and the balance was used to pay the remainder of the indebtedness. The Coles agreed to pay any debts over and above the amount advanced and they were to receive any surplus that might remain after the payment of the debts. At the time this contract was entered into, the Wabash-Chester Company owed the Illinois Central for interline freight, car per diem, and other miscellaneous bills, which were settled at twenty cents on the dollar. The receivership was terminated under the contract of April 17, 1920, and from that time until the appointment of the receiver on January 4, 1924, the road was operated at a loss. After April 17, 1920, all the stockholders of the Wabash-Chester Company except Cole, Randall, Gee and Evans were connected with the Gem Company. The directors of the Wabash-Chester Company were Jesse Dimond, Ray Dimond, C. B. Cole, Rea and Dillavou. Cole was president, Jesse Dimond vice-president and general manager, P. S. Dimond assistant general manager, Dillavou treasurer, and Ray Dimond secretary. The directors of the Gem Company were Jesse Dimond, Sr., Dillavou, Horn, Rea, Parkhill, Harris, Adams and two others. The officers were, Jesse Dimond, Sr., president, Thomas Horn and Chester Harris vice-presidents, Dillavou treasurer, and Rea secretary.

The contention of the Illinois Central is that all of its claim except for interline freight was based upon services rendered, equipment rented and materials and supplies furnished, all of which were operating expenses of such a character that they were necessary in the operation of the railroad; that these debts were of the class known as cur-

rent debts, properly chargeable to current receipts, and the Illinois Central looked to current receipts for its pay; that the Illinois Central afforded every facility possible so that the Wabash-Chester Company could operate its road; that the trust company and the bondholders had notice of what the Illinois Central had done, they received the benefits thereof, and their rights should be subordinate to the claim of the Illinois Central, or at least the claim should be paid as a preferred claim out of the net income of the receiver in the operation of the road; that during the time the claim was accruing the Wabash-Chester Company was operated by the bondholders, whose bonds are secured by the trust deeds being foreclosed; that the bondholders in operating the road used the amount due the Illinois Central for the improvement and betterment of the road to keep it in a fit condition to be operated and refused to pay the Illinois Central its claim; that these betterments consisted of land purchased, locomotives and materials, and the total amount expended for these items was over $168,000; that these additions, betterments and improvements automatically came under the trust deeds and into the hands of the re-receiver and the bondholders will obtain the benefits thereof; that the trust company and the bondholders allowed the Wabash-Chester Company to operate at a loss for two years knowing that it was not earning enough to pay interest or the expenses of operation; that nearly all of the claims, except for interline freight, were incurred within six months prior to the appointment of the receiver and come within the order of the court directing the receiver to pay in full the indebtedness incurred within six months; that the claim of $78,045.03 for interline freight arose not only from the operation of the road as a going concern, but the Wabash-Chester Company occupied a fiduciary relation with reference to the Illinois Central; that the money belonged to the Illinois Central and still belongs to it, and the Wabash-Chester Company was a trustee thereof charged

with the duty of promptly remitting the money to the Illinois Central; that the relation of debtor and creditor did not exist; that this claim represented monthly net balances from freight interchanged between the two railroads, and that the Wabash-Chester Company retained the money and the trust company and the bondholders received the benefit thereof.

As a general rule, courts will not decree a preference to be paid out of the *corpus* of the property ahead of the rights of a mortgagee unless there is proof of equities which justify such a decree. (*Gregg* v. *Metropolitan Trust Co.* 197 U. S. 183; *Union Trust Co.* v. *Morrison,* 125 id. 591; *Miltenberger* v. *Logansport Railway Co.* 106 id. 286.) Where bondholders have operated the property and because of fraudulent conduct accounts remain unpaid, they will be paid out of the *corpus* of the property. (*First Trust Co.* v. *Crooked Creek Coal Co.* 243 Fed. 450; *Central Trust Co.* v. *Chicago, Anamosa and Northern Railway Co.* 232 id. 936; *Queen Anne's Ferry Co.* v. *Queen Anne's Railroad Co.* 148 id. 41; *Kansas City Railway Co.* v. *Guardian Trust Co.* 240 U. S. 166; *Northern Pacific Railway Co.* v. *Boyd,* 228 id. 482.) In determining whether these claims are payable out of the *corpus* of the property in this case it is necessary first to determine who operated the Wabash-Chester railroad at the time these claims were incurred; whether it was operated by the bondholders, as contended by the Illinois Central, or whether it was operated by its own officers, who were also officers of the Gem Company, as was found by the master. The determination of this question depends upon the evidence.

The Coles had operated this railroad for many years and in so doing lost large sums of money. They practically owned its bonds and stock. The road had been in the hands of a receiver from 1914 to 1920 and owed debts of $100,000. It was to the interest of the Coles to dispose of the property and stop their losses. The railroad was

an outlet for the coal from the mines of the Gem Company, and it was to the interest of that company to keep the railroad in operation. The evidence shows that the Illinois Central derived considerable profit from freight on coal from these mines. It was therefore to the interest of all parties concerned to make the contract of April 17, 1920. By that contract the Coles became minority stockholders. They retained only 920 shares of stock and $300,000 of bonds. They lost control of the railroad. They could no longer elect the directors, dictate the policy of the road or have much voice in its management. After the sale C. B. Cole was elected director and president of the railroad. He testified that he protested against being elected president, but the officers of the Gem Company insisted that he should accept and finally he did accept; that he was only the nominal president; that he attended very few directors' meetings, had nothing to say about the manner in which the road was conducted and knew very little about its financial affairs. When we consider the evidence as to the manner in which the railroad was later conducted we think the evidence sustains his contention that he was only the nominal president and took very little part in conducting the affairs of the railroad. Not all of the stockholders were bondholders and not all of the bondholders were stockholders. There was no intent apparent from the evidence to merge the two estates. A stockholder has the right to hold mortgage bonds. There is no merger of the two estates unless an affirmative intention appears to that effect. To constitute a merger the two estates should unite in the same person in the same right. (27 Cyc. 1378.) The evidence does not sustain the contention that the railroad was operated by the bondholders.

The evidence does not show any fraud, deceit or concealment by either the Gem Company or the Wabash-Chester Company in their relations with the Illinois Central. Prior to the contract of April 17, 1920, the Illinois

Central had been dealing with the Wabash-Chester Company. It knew that the Wabash-Chester Company was not paying its bills, including those for interline freight. On the day the contract was entered into, the Wabash-Chester Company owed the Illinois Central $4078.75 for interline freight, which was settled for twenty cents on the dollar. The Illinois Central had every opportunity to know the provisions of the contract of April 17. Its officers advised the officers of the Gem Company as to how the railroad should be operated. The indebtedness of the Wabash-Chester Company to the Illinois Central after the contract of April 17, 1920, was voluntarily contracted, with full knowledge by the Illinois Central as to the amounts due from time to time. Whatever credit the Illinois Central extended was partly, at least, by reason of the fact that the officers of the Wabash-Chester Company were officers in control of the Gem Company and in expectation that the business would be profitable to the Illinois Central. The credit was extended on the promise that the Gem Company would pay the bills, and it was not extended with the belief of the Illinois Central that its claim would be paid solely from the receipts of the Wabash-Chester Company.

From April 17, 1920, to January 4, 1924, the Illinois Central and the Wabash-Chester Company were operating under the rules of the American Railway Accounting Officers' Association. These rules provided the manner in which accounts between railroad companies for interline freight should be kept, how settlements should be made, and provided a penalty for a refusal of a railroad to comply with the rules. · Rule 38 provided that "the settling carrier shall pay to each intermediate carrier its proportion of the interline freight revenue whether the freight charges are prepaid or collect, advances and prepaid to be included in the settlement with the way-billing carrier. Settlements shall be made on balances, which shall be subject to sight

draft on or before the 25th of the succeeding month, except where special arrangements are made between the interested carriers." This rule was not enforced. No drafts were drawn by the Illinois Central for interline freight, monthly settlements were not made, the officers of the Gem Company notified the Illinois Central that they would not honor drafts for interline freight, and no drafts were drawn. The Wabash-Chester Company agreed to pay by check. Checks were not regularly sent, the account was permitted to accummulate, and no attempt was made to compel compliance with the rules of the association. The money collected by the Wabash-Chester Company for interline freight belonged to the Illinois Central, but no steps were taken to keep it in a trust account, but with the knowledge of the Illinois Central it was kept in the general account with other receipts from other sources, and special agreements were made between the parties with reference to the payment of interline charges.

The Illinois Central sought to establish by "Exhibit 2" that the entire amount of the interline freight account was traced into improvements and betterments of the Wabash-Chester Company. The exhibit, however, was prepared upon an accrual basis, and merely shows that the Wabash-Chester Ccmpany had during that period the amount of money represented by the interline freight account available for the purposes into which it is claimed the money went. The exhibit does not prove, nor does any of the evidence show, where a single dollar went for any particular purpose. All investment accounts were kept on an accrual basis, from which operation, maintenance, improvements and betterments were paid. It is impossible from the evidence to trace any money received from any source to any improvement, betterment or permanent property. There was no evidence that the security of the stockholders or bondholders was increased by any contribution to this fund, but it was assumed that because certain property was purchased

and certain improvements made the security must have been improved. If it was improved there was no evidence to show from what source the money or credit came to make it. Shortly after the Gem Company bought this stock and these bonds the accounts of the Wabash-Chester Company with the Illinois Central became delinquent. G. J. Bunting, vice-president of the Illinois Central, had a talk with Dillavou, treasurer of the Wabash-Chester Company and of the Gem Company, in which the latter told Bunting that the Gem Company was operating the Wabash-Chester railroad and that the Illinois Central need have no fears about getting its money for these accounts; that the Gem Company would pay the bills. On October 1, 1921, the Illinois Central took certain notes of the Wabash-Chester Company which were indorsed by the Gem Company, being in payment of outstanding accounts of the Wabash-Chester Company. On March 1, 1922, the Illinois Central took fourteen notes of $1000 each, and one note of $426.65, in payment of amounts due from the Wabash-Chester Company. This last set of notes was not indorsed by the Gem Company. It certainly cannot be successfully contended that the balance due on these notes, which is over $16,000, is a preferred claim payable out of the *corpus* of the property. At another time the Illinois Central agreed to buy six cars of coal daily from the Gem Company, and fifty cents per ton was to be deducted from the account of the Illinois Central and credited on the account of the Wabash-Chester Company. On December 31, 1923, four days before the last receiver was appointed, the Illinois Central gave the Wabash-Chester Company credit for $8228.13 for coal delivered under this agreement. There is evidence tending to show that the Gem Company advanced about $700,000 during its period of operation of the road, which amount was used for various purposes. When all of the evidence is considered, we are of the opinion that the railroad was purchased and operated by the Gem Company for the purpose of affording

an outlet for its coal; that it was not operated by the bond-holders or for their benefit; that it is impossible to tell from the evidence whether the money paid for operating expenses and betterments was the money of the Illinois Central or whether it came from the $700,000 advanced by the Gem Company.

It is insisted that the bills accruing within six months prior to the appointment of the receiver should be paid as preferred claims out of the *corpus* of the property in accordance with the order of the court which was entered at the time the receiver was appointed. The order of the court directed the receiver to pay all debts due to laborers, servants, agents and employees for services rendered in and about the operation of the road and in and about the conduct and management of its business, such payments not to include debts due more than six months prior to the entry of the order. In support of this contention, *St. Louis, Alton and Springfield Railroad Co.* v. *O'Hara,* 177 Ill. 525, and *Whitaker* v. *Wabash, Chester and Western Railroad Co.* 206 Ill. App. 116, are cited. It will not be necessary to consider in detail the holdings of these two cases, for the reason that we do not consider them controlling when other authorities are considered. In *Turner* v. *I., B. & W. R. R. Co.* 8 Biss. 316, it was held that the period of six months prior to the receivership was the period within which allowance might equitably be made for payment of claims from current revenues, unless there had been some diversion of current income to bondholders which should have gone to the payment of current indebtedness. To the same effect is *Fosdick* v. *Schall,* 99 U. S. 235. There is no evidence in this case that there was any diversion of funds to bondholders at any time. In *Gregg* v. *Metropolitan Trust Co. supra,* it was held that a claim for railroad ties furnished within six months prior to the appointment of the receiver, where the ties were used to keep the road in operation, was

not payable out of the *corpus* of the property as against the rights of bondholders. Paragraph 63 of chapter 82 of our statutes (Smith's Stat. 1925, p. 1641,) provides for a preferred lien in favor of laborers and servants upon property in the hands of receivers to be paid in full, either out of the funds on hand or from the proceeds of sale of the property. Paragraph 49 of the same chapter gives a lien to all persons for supplies necessary in the construction, repair and operation of a railroad, upon all property of the railroad and against all mortgages or other liens which accrue after the commencement of the delivery of the articles or the commencement of the work or repair. In *Seymour* v. *Berg*, 227 Ill. 411, it was held that under these provisions of the statute the clear intention of the legislature was to place debts due to employees for labor in a preferred class and to require that they be paid in preference to other simple contract creditors who had no record lien; that these preferred claims are to be paid out of whatever interest the failing debtor had in the property or assets which went into the hands of the receiver; that the statute merely gives a preference to claims for labor or services but does not create a statutory lien upon all of the debtor's property; that a receiver only takes such interest or title as the failing debtor had, subject to all valid existing liens; that when the estate is reduced to cash the laborer is to receive payment of his claim first in point of time and to the full amount as against the claim of general creditors, and that, as a general rule, a receiver cannot acquire or receive any greater title or right than the insolvent debtor had. Under these authorities it was not the intention to permit any claims to come in ahead of the bonds unless there were special equities entitling them to do so. The chancellor held that the claims filed were valid and that the holders thereof were entitled to their pay but that the payment should only be out of current receipts. The chancellor properly refused to hold that these claims were payable out of the *corpus*

160

of the property or that the claims which accrued within six months of the appointment of the receiver should first be paid. To hold otherwise would invade the rights of the bondholders under their trust deeds, and the evidence did not justify such an invasion.

The judgment of the Appellate Court will be reversed and the decree of the circuit court will be affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment of Appellate Court reversed.*
*Decree of circuit court affirmed.*