COMMONWEALTH EDISON CO. v. CONTI-
NENTAL NAT. BANK & TRUST CO.
OF CHICAGO et al.

No. 6198.

Circuit Court of Appeals, Seventh Circuit.

Dec. 15, 1937.

J. F. Dammann, Charles Y. Freeman, and Sidney K. Jackson, all of Chicago, Ill. (Wilson & McIlvaine, of Chicago, Ill., of counsel), for appellant.

M. Paul Noyes, David O. Dunbar, Stanley Rich, Louis S. Hardin, Francis X. Busch, Cassius M. Doty, and John C. Slade, all of Chicago, Ill., Hovey C. Clark, of New York City, and Alexander F. Reichmann and Arthur M. Cox, both of Chicago, Ill. (David O. Dunbar, Arthur M. Cox, Stanley Rich, and Cassius M. Doty, all of Chicago, Ill., of counsel), for appellees.

Daniel J. Schuyler, of Chicago, Ill., for Albert A. Sprague, receiver for Chicago Rapid Transit Co.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

This controversy arises out of a preferential claim filed by the Commonwealth Edison Company in an equity receivership proceeding in the District Court. It involves a foreclosure of certain mortgages and trust deeds of the elevated railway properties of the Chicago Rapid Transit Company. The case was submitted upon an agreed statement of the parties under Equity Rule 77, 28 U.S.C.A. following section 723, supplemented by a stipulation of certain facts, and other oral and written testimony.

The claim, totaling $977,819.73, was for electric current furnished by the Edison Company for the operation of the cars, lights and equipment of the Transit Company during the period of six months immediately preceding the receivership. The master found that the power had been delivered and correctly computed pursuant to certain written contracts which were fair and reasonable, and allowed the claim as an ordinary one without preference. The report of the master was approved by the court over appellant's objections and exceptions, and from that order this appeal is prosecuted.

Appellant contends, (1) that its claim is entitled to priority over the claims of the mortgage trustees and bondholders by virtue of the six months' rule of the federal courts, applicable in railroad receiverships, under which certain creditors are allowed preferred claims for labor and supplies, necessary for the operation of the road, furnished during the six months immediately preceding the receivership, and (2) that its claim is entitled to priority over the trustee and bondholders under the First and Refunding Mortgage of the Chicago Rapid Transit Company, pursuant to the provisions of the Illinois Statute pertaining to liens upon railroads, Smith-Hurd Ill.Stats. c. 82, § 49.

The facts, concerning which there is no material controversy, are as follows: On June 28, 1932, the Westinghouse Electric & Manufacturing Company filed its creditors' bill against the Transit Company, and thereupon receivers of the latter's property and assets were appointed and took possession. On May 26, 1933, by leave of court, Continental National Bank & Trust Company of Chicago, as Trustee, filed its bill against the Transit Company in the District Court to foreclose a trust deed of July 1, 1923, executed by the Transit Company to secure certain of its indebtedness. This action was consolidated with the creditors' bill, and the receivership was extended to cover both.

Thereafter, a number of other trustees of mortgages or trust deeds executed by the Transit Company or its corporate predecessors, filed answers and counter-claims asking for foreclosure. A committee representing the holders of the bonds issued by the Transit Company and its corporate predecessors intervened and became a party.

Appellant, during the times herein referred to, was under a contract with the Transit Company, made through the latter's predecessors in 1912, to furnish, and it did furnish to the Transit Company, electric current for the operation of its trains, lights and equipment. For fourteen months immediately preceding the appointment of the receivers, appellant's account for electric current furnished and used by the Transit Company had not been paid. Accordingly, it timely filed its claim for the entire amount due, asking a preference only for that amount which had been furnished within the six months immediately preceding the receivership.

The power so furnished was used by the Transit Company in the operation of its trains, and it was essential to the operation of its road. There was no other source at those times from which that amount of power could have been secured.

At the close of business on December 27, 1931, the Transit Company had in the bank, available for whatever purposes it desired, exclusive of working funds and those set aside for specific purposes, the sum of $667,254.19. The operating revenues and expenses of the Transit Company, including appellant's accruals of power bills, for the six months preceding the receivership, were as follows:

| 1932 | Revenues | Expenses | Net |
|---|---|---|---|
| January | $1,270,444.39 | $996,729.74 | $ 273,714.65 |
| February | 1,200,408.81 | 954,436.24 | 245,972.57 |
| March | 1,300,437.57 | 995,062.52 | 305,375.05 |
| April | 1,217,108.80 | 912,033.88 | 305,074.92 |
| May | 1,159,464.36 | 902,008.83 | 257,455.53 |
| June (to and including the 28th) | 1,015,229.08 | 745,978.74 | 268,250.34 |
| | | | $1,656,842.66 |

During the same six months' period, payments were made by the Transit Company for interest on various bonded indebtedness and for sinking fund requirements to retire funded debt the following amounts:

| | Interest | Sinking Fund |
|---|---|---|
| January 1, 1932 | $ 350,431.02 | $ 53,394.00 |
| January 1, 1932 | 191,865.00 | 40,167.50 |
| Febuary 1, 1932 | 200,500.00 | |
| January 1, 1932 | 88,920.00 | |
| March 1, 1932 | 239,475.00 | 78,225.00 |
| April 1, 1932 | 99,050.00 | |
| May 1, 1932 | 10,175.00 | |
| | $1,176,416.02 | $171,786.50 |

At the close of business on June 27, 1932, the balance of cash on hand available for use by the Transit Company's treasurer, exclusive of working funds and those set aside for specific purposes, amounted to the sum of $612,036.38. The equity receivers took over from the Transit Company when they were appointed, materials and supplies of the value of $601,327.70 and other quick assets of the approximate value of $2,000,000. On the day the receivers were appointed the Continental Bank took over and applied on their unsecured loans the amount of the Transit Company's deposit balance in the sum of $527,107.41.

The master's report contains the following findings which seem not to be controverted:

"The stipulation * * * indicates that, for more than twenty years the Edison Company has been the dominant factor in the finances and operation of the Chicago Rapid Transit Company and its constituent companies.

"The Rapid Transit Company system is composed of the lines of the following companies, which prior to 1924 were operated independently by those companies; Metropolitan West Side Elevated Railroad Company, Northwestern Elevated Railroad Company, South Side Elevated Railroad Company, and Lake Street Elevated Railroad Company. * * * Prior to 1912 the Edison Company furnished a comparatively small part of the power used by the Metropolitan and Northwestern Lines, and none of that used by the South Side lines. * * * In 1911, a plan of reorganization was promulgated involving unification of three of the four lines, that is to say, all of them except the Lake Street Line, through the formation of a common law trust known as Chicago Elevated Railways, which acquired the capital stock of such companies. * * * This plan was apparently fostered by the Edison Company, which executed a $6,000,000 guaranty that the contemplated consolidation would be completed by July 1, 1914. * * * In February, 1912, shortly after the above unification plan was undertaken, Edison Company secured 25-year power contracts with the lines involved, and ever since, under those contracts, has been furnishing all the power required by the lines. * * *

"The consolidation not having become effective prior to June, 1914, the Edison Company satisfied its guaranty by paying approximately $7,000,000 for 207,966 shares of common participating certificates of the trust and $1,250,000 par value 6% debentures of the trust. * * * Subsequently, as part of the consideration for the extension of $14,000,000 of Chicago Elevated Railways 5% Gold Notes maturing July 1, 1916, to July, 1919, the Edison Company assigned to the trustee under said issue all claims against the three lines above referred to for power furnished prior to July 1, 1916, and also all sums thereafter to become due for power furnished until such time as the notes as extended should become due. * * * The amount of the power claims so assigned does not appear, but the subsequent reorganization plan dated July 14, 1923, discloses that the claims must have exceeded two million dollars. * * *

"In July, 1923, a plan of reorganization of Chicago Elevated Railways was promulgated, pursuant to which the Trust (Chicago Elevated Railways) above referred to was terminated, and the Metropolitan, Northwestern and South Side companies were consolidated into Chicago Rapid Transit Company, the defendant in this cause. In

January, 1924, in furtherance of said plan, Chicago Rapid Transit Company acquired the properties of * * * Lake Street Elevated by judicial sale. * * * For some time prior to the acquisition of this line, the Edison Company had been furnishing it all power required. Since its acquisition, all power needs of this line have been furnished under the provisions of the three power contracts above referred to. * * *

"In connection with said plan, all of the shares of common stock of Chicago Rapid Transit Company, excepting 15 shares, were transferred to voting trustees, and 203,000 trust certificates were issued therefor * * * of which 121,164 (approximately 60%) during the fourteen months period immediately preceding the receivership, were held by Commonwealth Subsidiary Corporation, a wholly owned subsidiary of the Edison Company. Of these certificates, all except 8,023.3 which were acquired from the public, were originally issued to the Edison Company and by it transferred to Commonwealth Subsidiary Corporation. * * * During the same period, Commonwealth Subsidiary Corporation also owned $9,048,360 out of a total issue of $18,561,800 Chicago Rapid Transit Company adjustment debentures. * * *

"In December, 1930, a plan was promulgated, involving consolidation of the Rapid Transit Lines and all of the Surface Lines (for which also the Edison Company was the sole source of power) into a new enterprise known as Chicago Local Transportation Company. The Edison Company was one of the prime movers in this enterprise, as is evidenced by the fact that in connection therewith Commonwealth Subsidiary undertook to guarantee payment of all principal and interest on such of the outstanding debenture bonds as should not be deposited under the plan, and the Edison Company, by separate agreement, guaranteed the performance by Commonwealth Subsidiary of its guaranty. * * * Moreover, in order further to assist in the completion of the plan, Commonwealth Subsidiary, during 1931, made collateral secured loans to the Rapid Transit Company aggregating $1,900,000 to enable that company to repay money borrowed to pay taxes. * * *

"Under the provisions of said Rapid Transit Company voting trust agreement * * * the trustees were required to vote the common stock of the company for election as directors of such persons as might be nominated by the holders of voting trust certificates. Commonwealth Subsidiary, as the holder of the majority of such certificates, had caused to be elected as directors for the two years immediately preceding the receivership the entire directorate of the Rapid Transit Company, which consisted of Samuel Insull, Sr., Samuel Insull, Jr., Edward J. Doyle, John Gulick and Britton I. Budd, all of whom, with the exception of Britton I. Budd, were, during the entire period, also executive officers and directors of the Edison Company * * * and Commonwealth Subsidiary presumably had so controlled the election of the board for many years prior to that time.

"After the 1923 reorganization and until May 1, 1931, the Rapid Transit Company paid its power bills monthly with approximate regularity. However, for the period of more than a year, from May 1, 1931, to the institution of the receivership, the Edison Company continued to furnish all the power required by the Rapid Transit Company without receiving payment of any part of its power bill * * * although by reason of its controlling position the Edison Company could have caused such bills to be paid had it so desired. The total amount of the unpaid power bill for this period is $2,339,198.88, of which only $977,819.73 is involved in this claim, the Edison Company having filed a general claim for the balance of $1,361,379.15, which accrued more than six months prior to the institution of these proceedings. * * *"

The "six months' rule," and the equitable principles upon which it is based were quite clearly stated in Fosdick v. Schall, 99 U.S. 235, 252, 25 L.Ed. 339. While much of the opinion in that case might well be considered obiter dictum, yet the cogency of the general principles therein set forth or implied, has been so universally recognized and approved by subsequent decisions that it is no longer open to question. In later cases other factual situations have appeared which have required a more specific statement of the rule, but in no case have we found a variation from the general principles therein laid down. In the Fosdick Case the Court said:

"The business of all railroad companies is done to a greater or less extent on credit. This credit is longer or shorter, as the necessities of the case require; and when companies become pecuniarily embarrassed, it frequently happens that debts for labor, supplies, equipment, and improvements are

permitted to accumulate, in order that bonded interest may be paid and a disastrous foreclosure postponed, if not altogether avoided. In this way the daily and monthly earnings, which ordinarily should go to pay the daily and monthly expenses, are kept from those to whom in equity they belong, and used to pay the mortgage debt. The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements. Every railroad mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income. If for the convenience of the moment something is taken from what may not improperly be called the current debt fund, and put into that which belongs to the mortgage creditors, it certainly is not inequitable for the court, when asked by the mortgagees to take possession of the future income and hold it for their benefit, to require as a condition of such an order that what is due from the earnings to the current debt shall be paid by the court from the future current receipts before any thing derived from that source goes to the mortgagees. In this way the court will only do what, if a receiver should not be appointed, the company ought itself to do. For even though the mortgage may in terms give a lien upon the profits and income, until possession of the mortgaged premises is actually taken or something equivalent done, the whole earnings belong to the company and are subject to its control. * * *

" * * * The appointment of a receiver is not a matter of strict right. Such an application always calls for the exercise of judicial discretion; and the Chancellor should so mould his order that while favoring one, injustice is not done to another. If this cannot be accomplished, the application should ordinarily be denied.

"We think, also, that if no such order is made when the receiver is appointed, and it appears in the progress of the cause that bonded interest has been paid, additional equipment provided, or lasting and valuable improvements made out of earnings which ought in equity to have been employed to keep down debts for labor, supplies, and the like, it is within the power of the court to use the income of the receivership to discharge obligations which, but for the diversion of funds, would have been paid in the ordinary course of business. This, not because the creditors to whom such debts are due have in law a lien upon the mortgaged property or the income, but because, in a sense, the officers of the company are trustees of the earnings for the benefit of the different classes of creditors and the stockholders; and if they give to one class of creditors that which properly belongs to another, the court may, upon an adjustment of the accounts, so use the income which comes into its own hands as, if practicable, to restore the parties to their original equitable rights. While, ordinarily, this power is confined to the appropriation of the income of the receivership and the proceeds of moneyed assets that have been taken from the company, cases may arise where equity will require the use of the proceeds of the sale of the mortgaged property in the same way."

In applying these principles the Supreme Court has said that before a claim, such as we have here, may be preferred and be given a superior equity as against prior mortgage bonds or current income, the debt must have been created with the expectation of the creditor, express or implied, that it would be paid out of the current earnings. Southern Railway Company v. Carnegie Steel Company, 176 U.S. 257, 20 S.Ct. 347, 44 L.Ed. 458; Virginia & Alabama Coal Company v. Central Railroad & Banking Company of Georgia, 170 U.S. 355, 18 S.Ct. 657, 42 L.Ed. 1068; Thomas v. Western Car Company, 149 U.S. 95, 13 S.Ct. 824, 37 L.Ed. 663. See, also, Louisville Bridge Co. v. Chicago, Indianapolis & Louisville Railway Co., 7 Cir., 253 F. 631; International-Great Northern Railroad Co. v. Binford, 5 Cir., 10 F.2d 496; Mercantile Trust Co. v. Tennessee Central Railroad Co., 6 Cir., 291 F. 462. In the first case referred to the Court said that whether the debt was contracted upon the personal credit of the company, without any reference to its receipts, was to be determined in each case by the amount of the debt, the time and terms of payment, and all other circumstances attending the transaction. In the Thomas Case the Court said that inasmuch as the principal officers of the claimant were in control of the debtor and its operations, the claimant must be treated as having full notice of the financial condition of the railroad company, and as having leased the cars to that company in reliance upon its general credit, rather than in expectation of

270

displacing the priority of the mortgage liens. See also Morgan's etc., Co. v. Texas Central Railway Co., 137 U.S. 171, 197, 11 S.Ct. 61, 34 L.Ed. 625; and Fordyce v. Omaha, Kansas City & Eastern Railroad Company, 8 Cir., 145 F. 544, 558.

■ From the cases referred to and all others to which our attention has been directed, or of which we have knowledge, we think the rule which governs the question before us is correctly stated by Mr. Cutcheon [1] as follows:

"Debts contracted by the railroad company within a reasonably short time prior to a receivership, whether under a foreclosure bill or a creditors' bill, that is to say, within a period, usually fixed at six months * * * for labor, supplies, or material or repairs necessary for the operation of the railroad as a going concern, if it does not appear that credit was given in reliance upon the railroad company's personal credit or some special security, are preferred over a lien of a mortgage and the claims of bondholders as to net income, whether that of the railroad company or that of its receivers, even if necessary as to income impounded by the mortgage trustees. * * *"

■ From this rule Mr. FitzGibbon in his article, "The Present Status of the Six Months Rule," 34 Columbia Law Review 230, has deduced, and we think properly, that to establish a right of preference in such cases, against either the income or property of the debtor, it is necessary to prove: (1) That the origin of the claim was a current expense of ordinary operation of the railroad, necessarily incurred to keep it a going concern; (2) that the claim accrued within a reasonably brief time (generally construed to be six months) prior to the appointment of the receiver; and (3) that the claim represented a debt contracted with the expectation or intention of the parties that it was to be paid out of the current earnings of the railroad.

It is urged by appellant that the cases relied upon by appellees were those in which other security was taken, or there were other rights reserved or existing upon which the claimant might rely. A reading of these cases, however, is quite convincing that the primary reason for disallowing the preferential claims was the lack of expectation or intention that they should be paid out of current earnings, and that lack of expectation or intention was conclusively established by the evidentiary facts of other security taken, or other rights reserved or existing. Any other conclusion would render the decisions irreconcilable.

■ Of course, there was no other security given or retained in the case at bar, but intention may be proved by other facts and circumstances, as stated in the Southern Railway Company Case. Prior to fourteen months immediately preceding the receivership one could readily believe that appellant's intention was to rely upon payment of its claim out of current revenue, for up to that time its bills were paid quite promptly each month out of the current earnings. We perceive no reason, however, why appellant could not have waived that intention, and this we think it did. During the fourteen months not a bill was paid although the earnings were sufficient to pay them, and appellant permitted them to accumulate in excess of $2,000,000. It made no effort to avail itself of the six-months' rule, or of the Illinois statute, if applicable, until another creditor filed its creditors' bill and secured the appointment of receivers. The District Court in passing upon the question of intention said: "It is clear from this record that the Commonwealth Edison Company, when it furnished the power in question, did not do so with the expectation that payment would be made out of current earnings. The conclusion is inescapable that the Commonwealth Edison Company was interested in the proposed reorganization; that it deemed it important that the Rapid Transit Company should make a good showing, and that it expected to receive its compensation when the reorganization plan was consummated."

This conclusion is amply supported by substantial evidence, and we think the court's ruling was correct in holding that appellant had not brought itself within the purview of the six-month rule.

The Illinois Railroad Lien Act, Laws 1871–72, p. 279, Smith-Hurd Ill.Stats. c. 82, § 49, under which appellant seeks protection to its claim here involved is entitled "An Act to protect contractors, sub-contractors and laborers in their claims against railroad companies or corporations, contractors or sub-contractors." So far as here pertinent it provides: "That all persons who

---

[1] "Some Legal Phases of Corporate Financing, and Regulation," (1931) p. 106.

may have furnished, or who shall hereafter furnish to any railroad corporation now existing, or hereafter to be organized under the laws of this state, any fuel * * * materials, supplies, or other article or thing necessary for the * * * maintenance [or] operation * * * of such roads, by contract with said corporation, * * * shall be entitled to be paid for the same as part of the current expenses of said road; and in order to secure the same, shall have a lien upon all the property, real, personal and mixed, of said railroad corporation as against such railroad, and * * * all mortgages or other liens which shall accrue after the commencement of the delivery of said articles: * * * Provided, suit shall be commenced within six months after such contractor * * * shall have completed his contract with said railroad corporation."

Appellant's contention in this respect is based on the following facts: (1) The power here involved was a part of the power continuously furnished under a contract with appellant since the date of its execution on February 1, 1912, and which ran for twenty-five years; (2) the lien of the Transit Company's First and Refunding Mortgage did not accrue until after February 1, 1912. Hence, it is argued that the delivery of the articles furnished, that is, the power, began before that mortgage lien accrued.

The Act here relied upon is in derogation of the Common Law and should be strictly construed. Liese v. Hentze, 326 Ill. 633, 158 N.E. 428.

It is urged by appellees that appellant was not a contractor within the meaning of the statute, and that appellant's claim is for the contract price of an intangible service which that statute does not contemplate. We think it unnecessary to pass upon these questions, because we are convinced that appellant's position is untenable for a more patent reason.

It was admitted that all power bills were paid monthly up to May 1, 1931. The Transit Company's First and Refunding Mortgage was executed in 1924, and dated as of July 1, 1923. All of the bonds issued and outstanding were issued long before May 1, 1931. We can not believe that appellant, which for many years dominated and controlled the Transit Company, intended or believed that the First and Refunding Mortgage of that company should be superseded in priority by its own claim for electrical power furnished eight years thereafter under a contract which the Transit Company had fully performed each month for twelve years at the time the mortgage bonds were issued. The conclusion with respect to appellant's good faith and its interpretation of the statute is supported by the fact that it voluntarily waived its alleged right under the statute as to more than $1,000,000 of its account covered by the eight months immediately following May 1, 1931. It permitted this amount to become a general claim, although the statute now relied upon was enacted in 1872.

We are convinced that in construing the statute with respect to the circumstances here presented, the date of the commencement of the delivery of appellant's power as applied to its claim for preference under the statute must be fixed not earlier than May 1, 1931. Hence the statute is not applicable.

Decree affirmed.