**In re CHICAGO & N. W. R. CO.**

**PULLMAN CO. v. CHICAGO & N. W. R. CO.**

**No. 7045.**

Circuit Court of Appeals, Seventh Circuit.
Feb. 24, 1940.

Rehearing Denied March 27, 1940.

426

Lowell M. Greenlaw, William J. Butler, Herbert S. Anderson, and Erwin W. Roemer, all of Chicago, Ill., for appellant.

Nye F. Morehouse, of Chicago, Ill. (William T. Faricy, of Chicago, Ill., of counsel), for appellee.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This appeal is taken from an order of the District Court in a railroad reorganization case, which disposed of claims filed by appellant for services rendered. The Court allowed one claim, disallowed another, granted a set-off, and classified the claims

as general and not entitled to priority. The appeal presents a problem going to the validity of the set-off and to the validity and nature of the claims in question, which in turn depend upon the character of the contract relation between the creditor and the debtor.

On June 28, 1935 the Chicago and North Western Railway, hereinafter referred to as the "Debtor" or "Railroad," sought reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, and by July 1, 1935 the Trustee was appointed. In due time the Pullman Company, hereinafter referred to as the "Creditor" or "Pullman" filed its claims. The claims as amended amounted to $94,731.82, and consisted of two items as follows: (1) Electric lighting from August 1933 to May 1934—$28,-348.04; and (2) Mileage from January 1, 1934 to July 1, 1935—$66,383.78.

The Trustee objected to the claims, and furthermore asked for a set-off amounting to $27,852.68. The controversy was then referred to a Special Master, who found that a balance of $495.36 should be allowed as a general claim against the estate of the Debtor. The Master allowed item No. 1, disallowed item No. 2, and granted the set-off in question. In its order the District Court adopted and confirmed the Master's findings of fact and conclusions of law, from which the Creditor appealed.

*Item No. 1. Electric Lighting.* In the instant case the bulk of the record stands on documentary evidence. Although some oral evidence was adduced, it is not conflicting nor does it present a question of credibility of the storyteller. The facts are not in dispute, and in such situations the legal deductions and conclusions of law drawn by the District Court, while worthy of great consideration, are not binding on this court. Nor are the findings conclusive on this court, unless supported by substantial evidence. See Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following Sec. 723c.

The District Court stated the situation in this case adequately, when it remarked that there was "apparently little or no difference between the parties as to what transpired," the only difference being "as to the legal effect of what transpired." And, for that matter, there is here no difference as to the proper disposition of item No. 1. The Trustee admits that the Debtor owes Pullman $28,348.04 for electric lighting service, and the evidence pertaining thereto is substantial. The order as to item No. 1 is affirmed.

*Set-off. Tourist Car Controversy.* In 1912 Pullman agreed to furnish sleeping car service on the Railroad's lines. This agreement was expressed in the form of a formal contract which governed their relationship for twenty years. Under it Pullman was to furnish Pullman cars and service. For this it was to receive the gross revenue per car per annum up to $7250, the Railroad was to take the next $1500, and the excess above $8750 was to be divided between them.[1] This division of the gross earnings, with the dividing line at $7250 and $8750, is referred to in Article 3, Section 3, paragraph 1 of the formal contract.

The 1912 contract also provided a formula for counting cars, and this formula was used to determine the average revenue per car operated. As to tourist cars, the formula stated that only 67% of their actual days service was to be used, instead of 100% as in the case of parlor and standard sleeping cars. The effect of this was to increase the average earnings per tourist car and thus to add to the amount that the Railroad would obtain under the division of earnings arrangement. This 67% provision, prescribing the method for determining the revenue per tourist car, is referred to in Article 3, Section 3, paragraph 3 of the 1912 contract.

After 1920 Pullman expressed dissatisfaction with the division-of-earnings arrangement and sought to modify the $7250-$8750 division point. After the war Pullman's operating expenses averaged approximately $8000 per car per annum, and the customary division point in contracts made with other railroads after 1920 generally was placed at $9000. Finally, in 1928, the 1912 contract was modified so that

---

[1] Pullman collected the fares charged for the use of the seats and berths. These collections constituted the Pullman revenues.

The expenses of the operation consisted generally in furnishing the Pullman cars, paying the Pullman employees, keeping the cars in repair and paying the taxes thereon. These expenses were paid by Pullman. In effect, Pullman conducted a rolling hotel business on the lines of the Railroad. See Chicago, St. L. & N. O. R. Co. v. Pullman Car Co., 139 U.S. 79, 89-90, 11 S.Ct. 490, 35 L.Ed. 97, as to character of sleeping car contract.

the gross revenue in excess of $7250 per car per annum was divided between them, instead of the first $1500 over the $7250 division point going to the Railroad as formerly.

Following this amendment in 1928 operations were continued, but a difference of opinion soon arose as to the extent of the amendment. Pullman argued that the amendment deleted paragraph 3 of Section 3 of Article 3 of the contract, that is, that it eliminated the 67% provision. On the other hand, the Railroad contended that the amendment merely changed the division of earnings referred to in paragraph 1 of Section 3 of Article 3, and on this contention based its right to the set-off.

The amendment was the result of an interchange of correspondence between the parties, and obviously its scope depends largely on an analysis of that correspondence. On December 5, 1928 Mr. Sargent (Railroad) wrote to Mr. Hungerford (Pullman) to this effect: "You desire to have us readjust our contract to the Illinois Central basis as to earnings per car that accrue to the Pullman. Company. * * * I would like to make this modified contract. * * * *In all other respects* we will let the old contract (1912) stand as it is."

Now, the Illinois Central contract, as made in 1915, was substantially similar to the 1912 contract, and contained as did the 1912 contract an Article 3 devoted to a division-of-earnings arrangement and to a 67% counting formula. However, in 1925, the Illinois Central contract was amended, so that *"in place of the provisions of Article 3"* there was substituted a completely new arrangement, namely, that the Railroad and Pullman would divide the revenue in excess of $7250 per car per annum.

More letters passed back and forth, and then on January 26, 1929 Mr. Hungerford wrote Mr. Sargent as follows: "I will

say to you now the proposition * * * to fix the *dividing line* at $7250, dividing equally the revenue in excess of that amount, is accepted." In return, on February 2, 1929, Mr. Sargent wrote Mr. Hungerford: "This letter may be treated by both of us as a sufficient contract * * *modifying Section 3* of Article 3 of the agreement (the 1912 contract) * * * so that * * * the Pullman Company will pay to the railway * * * one-half of all gross earnings * * * in excess of an average of $7250 per car per annum. Otherwise the existing contracts remain in *full force in effect and application.*"[2]

Evidently the correspondence stated above relates solely to changing the dividing line in the earnings, and it fails to mention the 67% formula. This appears to be significant in view of the fact that Section 3 of Article 3 of the 1912 contract gives separate treatment to (1) the dividing line in the revenues and (2) the 67% tourist car formula. A fair construction of the correspondence indicates an intent to modify Section 3 of the contract. To say that the intent was to delete Section 3 entirely is to compel a strained construction of the correspondence. The District Court found that the amendment in question did not eliminate the 67% provision. We believe the evidence supports this finding, and therefore the order pertaining to the set-off of $27,852.68 is affirmed.

*Item No. 2. Mileage.* When the 1912 contract expired late in 1932, Pullman refused to renew or extend it mainly because its old revenue provisions were no longer reasonable.[3] Revenue and expense conditions had changed tremendously. Average expenses had arisen to $8000 per car per annum, while average revenue per car had fallen. The 1912 contract had called for a division of the revenue at $7250.[4] So it happened that Pullman and the Railroad

---

[2] The italics originated with the court and emphasize the court's conclusion that the correspondence sought to modify, not to delete, the whole section of the contract. The correspondence was voluminous, but the letters referred to are representative.

[3] At first Pullman wanted to continue operations under the terms of the old contract minus the revenue division clauses, with the understanding that the new revenue arrangement would be dated back to 1932. The Railroad, however, wanted to regard the old contract extended in all its terms until a new

agreement was reached. Pullman's position to that was this: "We would be quite willing to go along without any formal interim arrangement for a reasonably short period * * * but we feel it necessary that in some way it be made definite and certain that the old contracts have terminated. * * *"

[4] When the 1912 contract was executed, the average expenses of Pullman operation were around $5750. Pullman was required to distribute the revenues only after the point of $7250 was reached, which provided Pullman with a $1500 operating margin.

started negotiations in an effort to consummate another formal contract.

In 1933 many discussions occurred between the parties, but no settlements were reached. In fact, the number of differences increased. For instance, on some of the Railroad lines Pullman service demand was weak and hence Pullman revenue thereon had fallen below $6000 per car per annum. The 1912 contract had not provided adequately for a corresponding reduction of Pullman cars in order to decrease expenses of operation.[5] Moreover, time brought out an absence of agreement on other points such as liability in the event of Pullman car damage, cancellation privileges, and the supplying of air-conditioned cars.[6]

In 1934 a more concerted effort was made to work out a suitable revenue plan. Pullman proposed that the Railroad should pay mileage on Pullman cars earning less than $6000 per year, but that if the revenue exceeded $8000 the excess would be applied against the mileage accruals. This mileage-revenue plan proved satisfactory to the Railroad, and it was accepted in the Hand letter and memorandum of April 20, 1934 as "the basis of the new contract for Pullman car operations to commence January 1, 1934" and to run for three years.

This draft of agreement incorporated the Hand mileage-revenue plan, but the Railroad refused to sign the instrument because it contained other provisions which the Railroad had not considered.[7] This same thing happened time and time again thereafter. At all times the Hand plan was incorporated in the drafts and accepted without thought of change. Yet each time the parties failed to execute the instrument, because they disagreed as to other provisions.

Thus, the interim between January 1, 1934 and July 1, 1935 passed. Nor was a formal contract consummated until late in 1936, at which a contract effective as of July 1, 1935 was executed by Pullman and the Trustee in behalf of the Railroad. This contract contained substantially the same mileage-revenue arrangement as in the Hand letter and memorandum. In the meantime Pullman had continued to furnish sleeping car service.

As to the claim for mileage, which was limited to the period from January 1, 1934 to July 1, 1935, the Special Master made the following findings of fact: (1) During the period in question the parties were negotiating for a formal contract which would include a mileage provision as well as other provisions; (2) The parties intended that once executed the contract would have retroactive effect to January 1, 1934; (3) The contract was never consummated during the period; (4) A contract was finally executed by Pullman and the Trustee late in 1936 and made retroactive to July 1, 1935; and (5) Sleeping car service was rendered during the interim. These findings are supported by the evidence.

From these findings the Master concluded that Pullman had not proved its claim because the Railroad had not promised to pay mileage. The District Court, on the other hand, stated that Pullman's

[5] The number of cars used on the Railroad lines was in the discretion of the Railroad under the 1912 contract. This was in 1934 a point of discussion as to whether control should remain in the Railroad or be vested in both parties.

[6] The 1912 contract imposed liability on the Railroad if its negligence was the cause of the damage to the Pullman cars. In 1934 the parties considered a new liability arrangement, and in the 1934 drafts appeared the provision that the Railroad was liable if the damage was from external cause and that Pullman was liable for damage from causes originating inside the cars.

In the first 1934 draft of agreement appeared provisions for short notice cancellation privileges and for a 3-year term. Then the air-conditioned cars appeared, and later the parties agreed to a 5-year term without cancellation rights to provide for proper amortization.

[7] Mr. Hand of the Railroad, witness for the Trustee, stated it in this way. "I found that the draft of agreement incorporated our understanding about the mileage payments, but it had included in it a number of new provisions quite different from the old arrangement." See footnotes 5 and 6.

There were two subsequent negotiations concerning the Hand mileage-revenue arrangement. The Railroad requested that the mileage payments be made quarterly instead of monthly. The change was made. Then Pullman modified the Hand plan in one particular, and this change was accepted by the Railroad.

Otherwise, the Hand mileage-revenue arrangement remained the same, a point on which the parties had agreed as early as April of 1934.

claim was grounded on implied contract,[8] and concluded that the reasonable worth of the services should be measured by the revenue provisions of the 1912 contract. We agree with the District Court that the claim is grounded on implied contract, but we do not agree with the Court's standard for measuring the reasonable value of the services rendered.

It is only necessary to refer to the discussion above related to conclude that the compensation basis of the old contract is not the proper standard for measuring the reasonable value of the services in question. The old revenue provisions were based on pre-war conditions of earnings and expenses. In 1934 and 1935 these revenue and expense conditions did not exist. It is for this reason that Pullman wanted a new revenue arrangement, and that the Railroad expressed its acceptance of the Hand mileage-revenue plan, upon which the claim here is based.

We are satisfied that the parties themselves realized that in the Hand plan they had a just and sound revenue arrangement, upon which operations could safely and harmoniously continue. Indorsement by both parties of this plan throughout 1934 and 1935, accompanied by disagreement as to other details, is potent evidence of its reasonableness. Incorporation of the mileage idea in the formal contract subsequently made, further adds strength to the reasonableness of the mileage-revenue plan during this period.

We conclude that on this record the Hand mileage-revenue plan of 1934 is the proper measure of the reasonable value of the services rendered from January 1, 1934 to July 1, 1935. The order disallowing the mileage claim of $66,383.78 is therefore reversed. The case as to this item is remanded with directions to ascertain the value of the services and to allow the amount determined, in conformity with this opinion.

*Priority.* The matter of priority in railroad reorganizations is governed by equity receivership rules. See 11 U.S.C. Sec. 205, sub. b, 11 U.S.C.A. § 205(b). This Court has already expressed itself adequately on the considerations supporting the so-called six months rule which extends preference to claims of labor and supply creditors. In Commonwealth Edison v. Continental Nat'l B. & T. Co., 7 Cir., 93 F.2d 265, 270, this Court explained that only claims having three characteristics are entitled to preference. The claim must be a necessary current expense of operations, it must accrue within a reasonably brief time prior to the receivership, and it must represent a debt contracted with the expectation of the parties that it be paid out of the current earnings of the railroad.

In the instant case the District Court found that the claims in question did not possess the required characteristics and concluded that they were not entitled to priority.[9] On the other hand Pullman contends that the claims fall within the scope of the six months rule, and counsel relies heavily on St. Louis, A. & S. R. Co. v. O'Hara, 177 Ill. 525, 52 N.E. 734, 53 N.E. 118, and Whitaker v. Wabash, C. & W. R. Co., 206 Ill.App. 116. We believe that the District Court was right on the question of priority.

We can not agree with counsel for Pullman that Illinois cases control in railroad reorganization cases brought in the Illinois federal courts. In fact, the court in the two Illinois cases cited by counsel

---

[8] It is clear that the Special Master treated the claim as based solely on express contract. Confining the claim in this way was not justified, even though Pullman stated that its claim "arises under operating contract arrangements."

The facts show that Pullman furnished sleeping car service and that the Railroad accepted and used the Pullman cars and services. We believe, as did the District Court, that Pullman is entitled to recover reasonable compensation.

Counsel for Trustee contends that the implied contract doctrine is not applicable because the Railroad was not a recipient of Pullman services and accommodations. The District Court found that the Railroad was the user of the Pullman cars furnished by Pullman. The evidence supports this finding. As to the character of the sleeping car contract, see Chicago, St. L. & N. O. R. Co. v. Pullman Car Co., 139 U.S. 79, 89, 11 S.Ct. 490, 35 L.Ed. 97.

[9] The District Court found that the electric lighting claim did not possess any of the three characteristics. It found the same thing as to the claim for mileage from January 1, 1934 to January 1, 1935. It found that the claim for mileage from January 1, 1935 to July 1, 1935 accrued within six months of the reorganization proceedings, but held that it did not possess the other two characteristics.

looks for guidance in the application of the six months rule to Fosdick v. Schall, 99 U. S. 235, 25 L.Ed. 339, and other federal opinions. Yet, even if applicable, the Illinois cases urged, merely show that on the facts therein the court exhibited a liberal construction of what constitutes ordinary current expenses of operation. Cf. St. Louis Union Trust Co. v. Wabash C. & W. R. Co., 334 Ill. 147, 158, 165 N.E. 632.

■ It should always be borne in mind that the doctrine of preference is an equitable one, yet one which is to be applied with caution. Kneeland v. American Loan & Trust Co., 136 U.S. 89, 98, 10 S.Ct. 950, 34 L.Ed. 379; Thomas v. Western Car Co., 149 U.S. 95, 111, 112, 13 S.Ct. 824, 37 L.Ed. 663. Every case is left to be determined on its own special equities, its own special facts, Southern Railway v. Carnegie Steel, 176 U.S. 257, 285, 20 S.Ct. 347, 44 L.Ed. 458, and a certain amount of discretion rests with the District Court as to whether the circumstances justify the application of the doctrine.

The claims in question arise under a course of dealing between Pullman and the Railroad, a course of dealing which differs materially from the relation that appears when a workman or an employee furnishes supplies or labor for the maintenance of a railroad. As a carrier of passengers, the Railroad was obligated to operate as many cars as were necessary to meet the requirements of travel. Instead of doing this, the Railroad employed Pullman, whose business was to manufacture and supply cars and in addition to perform Pullman sleeping car service in connection therewith. See Chicago, St. Louis, N. O. R. Co. v. Pull-

man So. Car Co., 139 U.S. 79, 89, 11 S.Ct. 490, 35 L.Ed. 97.

So we see that the requirements of passenger travel demanded Pullman cars and its incidental service—in effect, a traveling hotel. Instead of buying and operating the Pullman cars, the Railroad merely became a user of the cars and the necessary service. For this the user agreed that Pullman was to receive consideration or compensation, which in the main assumed the form of Pullman's collecting and keeping the revenues up to a certain amount. In addition, the Railroad was either to light the cars or to pay for the lighting thereof, and under certain conditions was to pay mileage for the use of the cars.[10]

■ It has been held that the particular obligations above described simply constitute a part of the consideration or compensation for the use of the cars, or, as it is generally called, "car rental." Pullman's Palace-Car Co. v. American Loan & Trust Co., 8 Cir., 84 F. 18, 23; Guaranty Trust Co. v. Seaboard Air Line Ry., D.C., 14 F.Supp. 555, 563, 564. We are inclined to agree with this view. And, of course, car rentals are not "materials and supplies." Mather Humane Stock Transp. Co. v. Anderson, 7 Cir., 76 F. 164, 166; Thomas v. Western Car Co., 149 U.S. 95, 13 S.Ct. 824, 37 L.Ed. 663.

■ However, on the facts and circumstances here, even though this were held not to be a case of car rental, it is certain that Pullman must be regarded as contracting upon the responsibility of the Railroad and not in reliance upon equity interference. Southern Railway v. Carnegie Steel, 176 U.S. 257, 285, 20 S.Ct. 347,

---

10. The electric lighting obligation of $28,348.04 accrued monthly in 1933–1934, a year prior to the reorganization proceeding. The Railroad came out of the 67% tourist car controversy, discussed in the opinion, believing that Pullman had failed to account for $27,852.68, so it set this off against the lighting debt. Thereafter, lighting bills were paid as they accrued. Under the circumstances Pullman did not press for a disposition of the item.

The mileage obligation of $66,383.78 accrued quarterly in 1934–1935, with an annual adjustment to be had at the end of the year. This obligation was part and parcel of the Hand mileage-division of the revenues arrangement. The purpose seems to have been two-fold, namely, to increase the revenues (subject to

division) on low-earning lines, and to encourage reduction of cars thereon as a means of reducing the cost of operation. During the period in question there was neither bills nor settlements made as to mileage, the understanding being that payments would ensue upon the execution of the formal contract.

We need not state whether the District Court erred in applying six months as a reasonable statute of limitations. See Commonwealth Edison v. Continental Nat. B. & T. Co., 7 Cir., 93 F.2d 265, 270; Cf. Wise v. Chicago, R. I. & P. Ry. Co., 7 Cir., 90 F.2d 312, 315, 113 A.L.R. 487. We do state, however, that the circumstances above related show that no expectation of preference was in the minds of the parties.

44 L.Ed. 458; see f.n. 10. The expectation of preference, one of the required characteristics, is obviously refuted and destroyed by the course of dealing existing between Pullman and the Railroad. The order of the District Court denying the claims priority under the six months rule is affirmed.

Affirmed in part, reversed in part, and remanded.